# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Richard Harter,

                      Plaintiff,                        **MEMORANDUM OPINION
                                                        AND ORDER**
            v.                                          Civil No. 11-2320 ADM/LIB

St. Mary's Duluth Clinic Health
System and Essentia Health,

                      Defendant.
_____

David H. Redden, Esq., and John A. Fabian, III, Esq., Fabian May & Anderson, PLLP,
Minneapolis, MN, on behalf of Plaintiff.

Joseph J. Mihalek, Esq., and Eric S. Johnson, Esq., Fryberger, Buchanan, Smith & Frederick,
P.A., Duluth, MN, on behalf of Defendant.
_____

## I.  INTRODUCTION

        On November 20, 2012, the undersigned United States District Judge heard oral

argument on Defendant's Motion for Summary Judgment [Docket No. 14] and Defendant's

Motion to Strike Pleading [Docket No. 26].  For the reasons stated on the record at oral

argument, Defendant's Motion to Strike Pleading is denied.  For the reasons stated below

Defendant's Motion for Summary Judgment is denied.

## II.  BACKGROUND[1]

        Defendant St. Mary's Duluth Clinic Health System and Essentia Health (collectively,

"SMDC") is a healthcare provider in Duluth, Minnesota.  Its Employee and Labor Relations

("ELR") Department administers and negotiates collective bargaining agreements ("CBA's")

---

[1] On a motion for summary judgment, the Court views the evidence in the light most
favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

with multiple unions, and provides various human resource services for both union and non-union employees, including sexual harassment and workplace investigations, corrective action plans, and unemployment insurance issues. Zanko Dep. 13-16, 30-31.[2] SMDC's ELR Department Manager is Jerry Zanko. Id. at 12-13. In 2009, SMDC sought candidates to fill Specialist positions in its ELR Department. Id. at 44, 88.

Plaintiff Richard Harter applied for one of the open positions. Harter was hired and started working for SMDC on September 28, 2009. Id. at 132. Approximately five weeks later, on November 2, 2009, Harter's employment was terminated. Id. at 243; Harter Dep. 138.

Prior to his employment with SMDC, Harter had been a union steward for United Auto Worker's ("UAW") Local 412, while he was concurrently employed by Chrysler as an auto designer. Harter Dep. 53-56. Beginning in 1993, Harter held multiple positions with the union including, chief steward, chairman, and vice president/servicing representative. Id. at 51-53; Harter Decl. Opp. Summ. J. [Docket No. 24] ("Harter Decl.") ¶ 3. In Michigan, from 2007 until early 2009, Harter had management responsibilities for the UAW, which he claims were the "union-side equivalent of a employer-side labor relations manager position like Jerry Zanko held. . . ." Harter Decl. ¶ 3. In January 2009, Harter voluntarily agreed to take an incentive severance and resigned his position with Chrysler. Harter Dep. 49-52.

---

[2] Joseph J. Mihalek submitted extensive exhibits attached to his affidavit in Support of Defendant's Motion for Summary Judgment [Docket No. 17] ("Mihalek Aff."). The Court received a courtesy copy of the filing, but the first three exhibits were not filed on CM/ECF. The attorneys for Defendant are directed to electronically file those exhibits. Exhibit 1 is the deposition transcript of Plaintiff Richard Harter. Exhibit 2 is the deposition of Jerry Zanko. And Exhibit 3 is the deposition of Renea Bourassa. Each will be referred to by name, rather than number (ex. "Zanko Dep.").

In May 2009, Harter applied for an ELR Specialist job at SMDC.  Harter Dep. Ex. 2. Then in early August 2009, Harter interviewed for the ELR position in Duluth, Minnesota.  Id. at Ex. 6.  At the interview, Zanko and the interview team emphasized that most of Harter's work as a specialist would be "grunt" work and only about 15% would be negotiating contracts.  Zanko Dep. 80-84.  They explained that in addition to administering contracts, the ELR Department handled a lot of routine issues, non-contract employee issues, sexual harassment investigations, and other duties that were not convenient and made it very difficult to plan out the workday.  Id. at 81-85; Bourassa Dep. 32.

Harter was offered the position of ELR Specialist in Duluth, but he rejected SMDC's initial job offer and instead accepted a position in California with the International Federation of Professional & Technical Engineers, Local 21 ("IFPTE").  Harter Decl. ¶ 7.

SMDC expressed a willingness to improve upon their offer.  Zanko Dep. 90-91, 95. Zanko called Harter to convince him that he should come work for SMDC.  Id. at 93-96.  Harter claims Zanko promised him:

1)      That "immediately [Harter] would get the responsibilities of Gary Diamond, [one of the former ELR Specialists], assume those contracts and lead negotiations for those contracts . . .";

2)      That Harter would act as lead negotiator on contracts in the near future; and

3)      That there were "numerous negotiations" coming up, and that Harter would be the "number one guy for contract negotiations," the "go-to guy."

4)      That Harter's position would include all negotiations between United Steel Workers ("USW") and SMDC's Pine Medical Center.

Harter Dep. 49, 221-22, 258-60, 264, 266; Compl. [Docket No. 1] ¶ 6.  Harter claims Zanko

worried that he had overplayed the "grunt work" aspect of the job and Harter responded that

"grunt work" was not the issue.  Harter Dep. 42.  Harter wanted assurances that being lead

negotiator was included in his job responsibilities.  Id.  Harter accepted SMDC's second offer.

Mihalek Aff. Exs. 15-16.

Harter reported for work at SMDC on September 28, 2009.  Compl. ¶ 9.  For the first two

weeks Harter spent most of his time familiarizing himself with various CBAs.  Harter Dep. 86-

89.  He repeatedly asked Zanko when he was going to negotiate contracts and repeatedly asked

to have contracts assigned to him.  Id. at 85-87.  Harter had problems accessing the computer

systems he needed to perform his work.  Id. at 223-30.  After living for some weeks in a hotel,

Harter and his wife entered into a six-month lease for a condominium in Duluth.  During the

third week, Harter tagged along with other ELR Specialists, sat in on a termination meeting,

attended a couple disciplinary meetings for other employees, and worked a couple very basic

assignments.  Id. at 86, 89-90.  Zanko heard that Harter was looking for another job and on

October 23, 2009, Zanko asked Harter if he was planning to quit his job.  Harter Dec. ¶ 11;

Zanko Dep. 165-66; Compl. at ¶ 14.  Zanko and Harter had a conversation about Harter's

dissatisfaction with the job thus far and after that Harter was assigned many assignments on a

piecemeal basis by other ELR Specialists and the administrative assistant, but he was not

assigned any CBAs to administer.  Harter Dep. 86-87; Harter Dec. ¶ 13.  On October 31, 2009,

Harter and his wife drove to Michigan to pick up their belongings and move them to Duluth.

Compl. at ¶ 20.  On November 2, 2009, before Harter had left to return to Duluth, Zanko called

Harter and terminated his employment, citing poor work performance and lack of enthusiasm for the job.  Id. at 21; Zanko Dep. 243; Mihalek Aff. Ex. 18.

Harter claims Zanko's representations were false and Zanko induced Harter to move to Duluth based upon these false representations.  Zanko claims he offered Harter more money, but did not offer Harter more duties than the ELR Specialist position described at his interview. Harter claims Zanko's representations caused Harter to change his mind about working for IFPTE; therefore, he accepted SMDC's second offer.  Mihalek Aff. Ex. 15-16.

Harter claims SMDC is liable for fraudulent inducement in violation of Minnesota Statute Section 181.64, for fraudulent misrepresentation, and for Harter's detrimental reliance on promises made by SMDC under a theory of promissory estoppel.  Id. at ¶ 22-35.  SMDC moves for summary judgment on all three counts.

### III.  DISCUSSION

**A.  Standard of Review**

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig, 54 F.3d at 470.  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate.  Id.

### B.  Minn. Stat. § 181.64

Minn. Stat. § 181.64 provides in relevant part:

> It shall be unlawful for any person, partnership, company, corporation,. . . doing business in this state . . . **to induce**, influence, persuade, or engage any person to change from one place to another in this state, or to change from any place in any state, territory, or country to any place in this state, to work in **any branch of labor** through or by means of **knowingly false representations** . . . concerning the **kind or character** of such work, . . . . (emphases added).

SMDC argues for summary judgment on four grounds.  First, SMDC argues Harter is not entitled to the protection of Minn. Stat. § 181.64 because "any branch of labor" means "manual labor" and Harter is not a manual laborer.  Second, even if § 181.64 applies, SMDC, through Zanko, did not induce Harter to move to Minnesota.  Third, even if Zanko did induce Harter to move to Minnesota, Zanko did not make knowingly false statements regarding the kind or character of the work entailed by the ELR Specialist position.  Finally, SMDC argues Harter made admissions precluding his ability to recover under § 181.64.

### 1)  Branch of Labor

Minnesota courts have not explicitly interpreted the phrase "any branch of labor." SMDC urges that similar statutes in other states be compared to Minn. Stat. § 181.64.  However, it is not necessary in this case to define "any branch of labor."  Plaintiffs have provided several examples of Minnesota courts applying Minn. Stat. § 181.64 to white collar professional work other than manual labor.  See McGrann v. First Albany Corp., 424 F.3d 743 (8th Cir. 2005) (managing director of institutional equity sales); Ewald v. Royal Norwegian Embassy, Civ. No. 11-CV-2116 (SRN/SER), 2012 WL 4794055 (D. Minn. Oct. 9, 2012) (Higher Education and

Research Officer); Vaidyanathan v. Seagate U.S. LLC, Civ. No. 09-1212 (DWF/JSM), 2010 WL 2925067 (D. Minn. July 21, 2010) (semiconductor yield engineer); Jackson v. Navitaire, Inc., Civ. No. 04-1557 RHK/AJB, 2005 WL 61490 (D. Minn. Jan. 11, 2005) (marketing director).  In addition, had the legislature intended "any branch of labor" to refer only to  "manual labor" it could have said so.  See Brayton v. Pawlenty, 781 N.W.2d 357, 363 (Minn. 2010).  Instead, the legislature expressed concern about employers inducing employees to move in "any branch of labor."  Therefore, Minn. Stat. § 181.64 is not limited to manual labor.

### 2) Inducement

A material issue of fact exists as to whether Harter was induced by SMDC to move to Minnesota for the ELR position.  SMDC contends Harter could not have been induced to move because Harter was unemployed at the time of his job search and was looking for any job offer regardless of the kind or character of the work.  However, the language of Minn. Stat. § 181.64 does not require plaintiff be induced to leave current employment and SMDC cites no cases where this requirement has been read into the statute.  Additionally, the record includes evidence that Harter refused SMDC's initial offer of employment.  The parties then bargained for an arrangement that would convince Harter to reject the offer in California and accept SMDC's offer in Minnesota.  A reasonable jury may decide that Harter was induced to move to Minnesota for employment.

### 3) Knowingly False Statements

Minn. Stat. § 181.64 requires a plaintiff to prove more than an inducement; it also requires a plaintiff to prove the employer made knowingly false representations about the kind or character of a plaintiff's job duties.  Vaidyanathan v. Seagate US LLC, 691 F.3d 972, 977 (8th

Cir. 2012).  At the summary judgment stage, a plaintiff must present specific facts that the defendant knew the representation was false at the time it was made and that the representation concerned the "kind or character" of the work to be done.

First, SMDC argues that Zanko's alleged representations did not concern the "kind or character" of Harter's work because Zanko's alleged representations concerned *when* Harter could expect to take over lead negotiation responsibilities, not *whether* Harter would have negotiation responsibilities.  SMDC cites <u>Kanner v. Fairmont Foods of MN, Inc.</u>, 2000WL 31790, at *2 (Minn. App. 2000), an unpublished case, for the proposition that the "kind or character" requirement of Minn. Stat. § 181.64 is limited to the employer's representation of an employee's job duties and therefore cannot include an employer's representation of *when* those job duties begin.  But, <u>Kanner</u> does not address the question of *when*, it addresses the question of *where*.  The Court in <u>Kanner</u> ruled that Minn. Stat. § 181.64 covers the "work to be performed rather than the location of its performance...."  <u>Id.</u>  *When* an employee will be given job duties and responsibilities does affect the kind and character of a job.  Clearly, an employer could not represent to a perspective employee that she will immediately have the duties of CEO of a company, hire her, and then tell her that she will have the duties of the CEO eventually.  At Harter's interview in Duluth, Zanko emphasized that 85% of an ELR's job would be "grunt work" and only 15% of the work would involve contract negotiations.  Harter turned down this first offer.  Harter accepted a subsequent offer.  SMDC argues that Harter accepted the new offer because it offered better pay and the future opportunity to lead negotiations.  Harter argues he accepted the new offer because SMDC offered him an ELR Specialist job that was fundamentally different than the first, a job which would give him immediate opportunities to

8

manage and negotiate collective bargaining agreements.  If Zanko falsely represented when Harter would be assigned the job duties he was offered, then Harter may have a claim that the kind or character of his job was falsely represented.

In addition, Harter disputes more than the timing of his job responsibilities, he also claims Zanko never intended to give him the substantive work he was promised.  Harter alleges he was promised responsibility over Gary Diamond's contracts, but did not receive them.  He also claims he was promised work concerning the ongoing USW and Pine Medical Center negotiations. Harter presents specific facts about representations for his job duties which a reasonable jury could find affected the kind or character of his work.

Second, SMDC argues Harter cannot prove that Zanko knowingly misrepresented the ELR position.  SMDC cites Anderson v. Alorica, Inc., 2004 U.S. Dist. LEXIS 8852 (D. Minn. May 18, 2004), at *13-14, for the proposition that a plaintiff cannot sustain a claim against a defendant if the plaintiff's claim is based on his own unfounded inferences.  The Anderson Court gives a vivid example of its point: "To grant [plaintiff] relief in this case would be tantamount to granting relief to a coal miner persuaded to work for Minnesota Mining and Manufacturing ("3M"), only to find out that 3M has no coal mines."  Id.  Harter's case is not so obvious.  Unlike in Anderson, Harter was not making unfounded inferences.  Harter had reason to believe Zanko, as head of the ELR department, could tailor Harter's work responsibilities to Zanko's representations.  A jury could reasonably find that as the head of the ELR department, Zanko was in a position to know if his representations were true or false.

### 4)  Admissions

Finally, SMDC claims Harter admits he has no evidence that he would not have been assigned lead negotiator responsibilities at some time on some contracts, including on contracts previously assigned to Diamond, and that Zanko never promised Harter a job different than the job set out in the ELR Specialist job description.  Def's Supp. Mot. Summ. J. 26-7 (citing, Harter Dep. 209:24-210:13, 213:17-21, 254:11-17).  But, Harter claims he was promised lead negotiator status and responsibilities immediately.  SMDC's cited deposition material does not contradict Harter's central claim.  That SMDC might later have elevated Harter to a lead negotiator position within the ELR Specialist group is irrelevant to the claimed promise of being the lead negotiator when he began his employment with SMDC.  Harter is not precluded from bringing his Minn. Stat. § 181.64 claim.

### C.  Fraudulent Misrepresentation

At the summary judgment stage, Harter must present evidence that: (1) Zanko made a false representation of past or present material fact that is susceptible to knowledge; (2) Zanko either knew the representation was false or asserted it as true without knowing it was true or false; (3) Zanko intended Harter to act on the false representation; (4) Harter did, in fact, act in justifiable reliance on the false misrepresentation; and (5) Harter suffered damages as a proximate cause of the representation.  See Evertz v. Aspen Med. Group, 169 F. Supp. 2d 1027, 1030 (D. Minn. 2001); Heidbreder v. Carton, 645 N.W.2d 355, 367 (Minn. 2002).  SMDC disputes Harter's prima facie evidence of elements 1, 2 and 4.

The parties disagree whether Zanko's representations were of past or present material fact, susceptible to knowledge.  Zanko allegedly told Harter that Harter would "immediately"

assume the responsibilities of Gary Diamond; that Harter would act as lead negotiator on contracts in the near future; that there were "numerous negotiations" coming up; and that Harter would be the "number one guy for contract negotiations," the "go-to guy."  SMDC characterizes these statements as general, indefinite representations of Harter's future with SMDC.  Harter disagrees and claims Zanko was representing the present status of his job upon joining SMDC. It is true that statements more akin to opinions than statements of fact are not actionable in fraud. Evertz, 169 F. Supp. 2d at 1031 (citing, Martens v. Minnesota Mining & Mfg. Co., 616 N.W.2d 732, 746 (Minn.2000)).  But here, when taking the facts in the light most favorable to Harter, a reasonable jury might find that when Harter rejected SMDC's first offer and then accepted the second, he reasonably expected to immediately assume the negotiating responsibilities Zanko allegedly offered him.

Additionally, Zanko was in a position to know the status of Gary Diamond's projects and whether Zanko intended Harter to immediately manage them.  Zanko was also in a position to know if the job offered to Harter would involve lead negotiations on any current or upcoming contracts, such as the USW/Pine Medical Center negotiations.  The presence of these contracts and their concomitant job responsibilities are sufficiently specific facts to pass the summary judgment hurdle.

The parties also disagree as to whether Harter justifiably relied on Zanko's alleged misrepresentations in deciding to accept the position at SMDC.  SMDC argues that a single e-mail Harter sent to a friend reveals that Harter "made up his mind" about working for SMDC before Zanko's representations on August 23,2009.  On August 7, 2009, Harter wrote,

> I really like Duluth. Great for boating. Really didn't plan on coming here. Had 7
> interviews in a two week span. Duluth was my last stop and really only came up

11

> here for a free trip, but when I got to the airport I immediately made up my mind. Much to Linda's dismay I turned down a warm climate SF job.

Mihalek Aff., Ex. 13.  However, this e-mail is not dispositive.  Harter claims that his e-mail expressed his preference for living in Duluth, not his decision to take the ELR position at SMDC.  Further, Harter accepted a second offer for an IFPTE position in California before Zanko improved his offer at employment.  Whether Zanko's representations changed Harter's mind and whether Harter relied on Zanko's representations is a material issue of fact for jury consideration.  Therefore, summary judgment is denied.

### D.  Promissory Estoppel

Promissory estoppel is an equitable remedy that enforces a promise, or provides for detrimental reliance damages, where no express contract of employment exists.  Martens, 616 N.W.2d 732, 746 (Minn. 2000) (citing, Grouse v. Group Health Plan, Inc., 306 N.W.2d 114, 116 (Minn. 1981)).  It requires proof that 1) a clear and definite promise was made, 2) the promisor intended to induce reliance and the promisee in fact relied to his or her detriment, and 3) the promise must be enforced to prevent injustice.  Id.  In the at will employment context, the measure of damages reflects the degree to which Harter relied on the promise, not the amount he would have earned from SMDC.  Grouse, 306 N.W.2d at 116; see also Cohen v. Cowles Media Co., 479 N.W.2d 387, 391-392 (Minn. 1992).

SMDC argues Harter's promissory estoppel claim is barred by his signature of a written confirmation letter accepting the position of ELR Specialist.  Mihalek Aff., Ex. 17.  But the written confirmation letter cannot be construed as a contract because the letter itself states, "This offer letter is not an employment contract and is not intended to diminish [Harter's] employment

at will." Id.  Minnesota law allows promissory estoppel claims in the at will employment

context for promises made which induce a plaintiff to act in anticipation of his work for an

employer.  Grouse, 306 N.W.2d at 116.

First, Harter provides evidence that Zanko's alleged misrepresentation was a clear and

definite promise about the job for which Zanko was hiring Harter.  Harter has presented evidence

Zanko promised an ELR Specialist position taking over Gary Diamond's contracts and

responsibilities.  Zanko also promised Harter a lead negotiator role in ongoing contracts,

including the USW/Pine Medical Center negotiations.  Second, as discussed above, Harter has

adduced evidence that he relied to his detriment on Zanko's representation when he took the job,

when he relocated to Duluth, Minnesota, and when he signed a six-month lease for an apartment.

Third, a reasonable jury could find the extent these actions constitute an injustice resulting from

broken promises.  Harter's promissory estoppel claim thus survives summary judgment as a

matter of law.

Harter and Zanko clearly had a tumultuous five weeks of employment.  Harter expected

to step immediately into a more powerful position than SMDC had available at the time.  Zanko

viewed Harter as a new employee.  Zanko had to train and familiarize Harter with SMDC and

the work that SMDC needed to have him do.  Zanko made a decision that after five weeks of at-

will employment, Harter's expectations were bigger than the job and Harter had little to no

interest in performing the "grunt work" at SMDC.  Harter was not fitting in with the culture and

mission of SMDC.  Taking all the facts in the light most favorable to the plaintiff, Harter's

claims survive summary judgment.  A jury is best equipped to decide the credibility questions

raised by the different facts presented by the parties.

### IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that: Defendant's Motion for Summary Judgment [Docket No. 14] is **DENIED**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  January 29, 2013.

14